

FILED _____ LODGED
_____ RECEIVED
OCT 04 2019
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Dena R. Walker, APRN, CNM; | NO. **CV 19 5945** RJB |
| STATE OF WASHINGTON *ex rel.* Dena R. Walker, ARNP, CNM; and | **FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL** |
| DENA R. WALKER, APRN, CNM, individually, | <u>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)</u> |
| Plaintiffs, | **DO NOT ENTER ON PACER** |
| v. | **DO NOT PUT IN PRESS BOX** |
| UNITED WOUND HEALING, P.S., | |
| Defendant. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### I.     INTRODUCTION

1.      Plaintiff Dena Walker brings this action individually, and on behalf of Plaintiffs United States and the State of Washington under the Federal False Claims Act, 31 U.S.C. §§ 3729 – 3733 (the "False Claims Act" or "FCA") and the Washington Medicaid Fraud False Claims Act ("WFCA"), RCW §§ 74.66.005 – 74.66.130, against Defendant United Wound Healing, P.S. ("United") to recover, among other things, damages and penalties owed as a result of a systemic fraud that United has perpetrated against the government.

COMPLAINT AND JURY DEMAND - 2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

 2. In short, United, which provides wound care treatment to residents in skilled nursing facilities, has engaged in several fraudulent schemes resulting in thousands of false claims being presented to and paid by the United States and the State of Washington. First, United improperly bills government healthcare programs, including Medicare and Medicaid, for complex and comprehensive evaluation services, when, in reality, a more focused and less complex evaluation is indicated and provided.

 3. Second, in violation of established Medicare and Medicaid laws, regulations, and policies, United has implemented a company-wide policy whereby wound care specialists who evaluate patient wounds and then perform procedures during the same visit to treat those wounds (such as a wound debridement) improperly bill government healthcare programs, including Medicare and Medicaid, for both the evaluation and the procedure.

 4. Third, in violation of the Federal Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a-7b(b), United has and continues to provide improper bonuses to Licensed Practical Nurses ("LPNs") it employs based on the number of residents they identify and refer to United wound care specialists for wound evaluation and treatment. As a result of these incentives, the LPNs routinely select patients for evaluation and treatment who have no wounds needing such evaluation or treatment. United's wound care specialists then evaluate these patients, and United requires them to bill government healthcare programs, including Medicare and Medicaid, for reimbursement for these unnecessary services, falsely certifying that they were medically necessary and reasonable.

 5. Plaintiff Walker, an Advanced Practice Registered Nurse ("APRN") and experienced wound care specialist who worked for United, witnessed these unethical practices and expressed her concerns about the unethical conduct to United's senior management, including its CEO. Rather than correct the problem, United terminated Plaintiff in retaliation for speaking up.

COMPLAINT AND JURY DEMAND - 3

6.      Plaintiff Walker now seeks recovery on behalf of the United States and the State of Washington under the FCA and WFCA for United's illicit scheme, and on behalf of herself for United's retaliatory conduct and wrongful termination.

## II.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over the federal FCA claims under 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1331 and 1345.  The Court has subject matter jurisdiction over the WFCA under 31 U.S.C. § 3732(b), because the claims seek recovery under state law for funds paid by the State of Washington and the action arises from the same transactions and occurrences as the federal FCA claim.  This Court has subject matter jurisdiction over Plaintiff Walker's claim under the federal FCA for retaliatory conduct and wrongful termination under 31 U.S.C. § 3730(h) and 28 U.S.C. § 1331.  It further has subject matter jurisdiction over her common law wrongful termination claim under 28 U.S.C. § 1367 because said claim is so related to the claims in this action over which the Court has original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

8.      This Court has personal jurisdiction over United because it is domiciled in the State of Washington, and because section 3732(a) of the FCA permits worldwide service of process, and United is a United States domiciled company doing business throughout several states.  Venue is appropriate in this District under section 3732(a) of the FCA because United transacts business in this District, including Seattle, can be found in this District, and because several of the illegal acts proscribed by the FCA occurred in this District.

## III.      PARTIES

9.      Plaintiff Walker is a licensed APRN and certified nurse-midwife (CNM) specializing in, among other things, providing wound care.  She currently resides in Eagle Mountain, Utah.

10.     United is a Washington health care company with its principle place of business in Puyallup, Washington.

COMPLAINT AND JURY DEMAND - 4

1

2

## IV.    GENERAL ALLEGATIONS

A.    United's Improper Billing Practices and Bonus Program.

3

4    11.    United is in the business of providing wound care evaluations and treatment to

residents in skilled nursing facilities.  United contracts with the facilities at no cost to the

5    facilities, and then sends roving nurses to visit the facilities onsite to evaluate and treat residents

6    in need of wound-related care.  United services facilities in the states of Washington, including

the Seattle area, Oregon, Utah, and Idaho, and is currently expanding into several other states.

7
8    12.    The vast majority of the patients that United evaluates and treats are elderly

and/or disabled patients covered by government healthcare programs, including Medicare,

9    Medicaid, and the Veterans Health Administration ("VHA").  United is reimbursed by Medicare,

10    Medicaid, and other government health care providers for the wound treatment services it

11    provides.

12    13.    United identifies patients for treatment at the facilities through, among other

things, what are referred to as "skin sweeps."  These sweeps are conducted in the facilities by the

13    United LPNs, who hold the title of Clinical Resource Nurse ("CRN").  While they have

14    knowledge and experience about wound care, United's LPNs are not qualified to independently

15    evaluate patients for wound care or to provide wound care treatment.  Rather, their job is to

16    identify patients that present potential wound care issues and refer them to United's wound care

17    specialists, who are APRNs (or hold similar certifications) and are qualified to evaluate and treat

18    patients for wound-related issues.

19    14.    During the skin sweeps, the United LPNs are supposed to examine patients and

identify those that present with wounds that they believe warrant further review.  The United

20    LPNs then refer these patients to United's wound care specialists for a wound evaluation.  The

21    United LPNs do not bill government healthcare programs for these screenings, as LPN reviews

22    are not covered services under those programs.  The wound specialists bill government

23    healthcare programs directly for the evaluations and other wound care services they provide.

24

COMPLAINT AND JURY DEMAND - 5

1
2
3
4
5
6
7
8

15.     Plaintiff Walker began working at United in May of 2018 as a wound care specialist, servicing United's contract facilities in Utah.  Upon commencing her employment, Plaintiff Walker witnessed and experienced pressure from senior management to increase the number of patients evaluated and treated for wound-related issues.  This pressure came directly from CEO Ryan Dirks and other senior management.  During weekly meetings Dirks and other senior management emphasized the need to increase revenues by seeing more patients.  Dirks and other senior management placed a special emphasis on increasing the number of new patients identified and evaluated for wound care, telling the staff that increasing first-time evaluation is three times more valuable than follow-up visits.

9
10
11
12
13
14
15
16

16.     To meet its revenue goals, United imposed a quota on its wound care specialists. The specialists were required to evaluate and treat six to eight patients an hour, leaving in many cases less than 10 minutes per patient.  Those who fell behind in their quotas were pressured by senior management, including Dirks and regional managers, to increase the number of patients they evaluated.  Additionally, wound care specialists were pressured to increase their rates of procedures, including debridement procedures.  Plaintiff Walker told and emailed her superiors, including a senior regional manager, on several occasions that the model of seeing six to eight patients per hour was unworkable, particularly given her lack of resources and support, and that it compromised patient care.  United, however, did nothing to correct the problems.

17
18
19
20
21
22

17.     Instead, to keep Plaintiff and the other wound specialists on track, company managers distributed periodic reports, called "dashboards," to senior management and all the specialists, showing each specialists' monthly rates of total patients seen, new patients seen, rates of debridement over the population of patients seen, and financial numbers, including the monthly revenue and profit purportedly attributed to each individual wound care specialist. These reports came in the form of tables and line graphs showing each wound care specialist's monthly trends in patients seen and debridement rates.

23
24

COMPLAINT AND JURY DEMAND - 6

18.     In its drive to maximize profits, United hatched several schemes, still ongoing today, which are in direct violation of Medicare and Medicaid laws, regulations, and policies. These include (1) a scheme to upcode evaluation and management ("E&M") services to services that were not performed and/or not medically necessary; (2) a scheme to double bill government healthcare programs by unbundling E&M services from procedures performed during the same visit; and (3) a scheme to offer and pay bonuses to the United LPNs that are tied directly to the number of patients that the LPNs identify and refer to the wound specialists for evaluation.

      1.     **United's Improper Upcoding Scheme.**

19.     Healthcare providers use what are known as Current Procedural Terminology ("CPT") codes to report medical services performed on patients to government healthcare carriers, including Medicare and Medicaid carriers.  E&M services are organized into various categories and levels.  In general, the more complex the visit, the higher the level of code that applies, and the higher the reimbursement for the provider.  Medicare and Medicaid laws, regulations, and policies provide that to be reimbursable, the E&M service must be medically necessary and meet all of the requirements of the CPT code. *See, e.g.,* Medicare Claims Processing Manual, chpt. 12, § 30.6.1(A).  It is not medically necessary or appropriate to bill a higher level of E&M service when a lower level of service is indicated or provided. *Id.*

20.     The applicable CPT codes for E&M services at issue are those that relate to E&M services in skilled nursing facilities, CPT codes 99304 – 99309.  CPT codes 99304 – 99306 are for "initial" nursing facility care evaluations, while CPT codes 99307 – 99309 are for "subsequent" nursing facility care evaluations.

21.     The codes for initial evaluations are for more complex visits and require three key components: (1) a detailed or comprehensive history; (2) a detailed or comprehensive examination; and (3) medical decision making ranging from straightforward to complex (the more complex the decision making the higher the CPT code).  The typical time spent on these

COMPLAINT AND JURY DEMAND - 7

1  visits at the patient's bedside and on the patient's facility floor or unit ranges from 25 minutes for

2  the lowest CPT code (99304) to 45 minutes for the highest CPT code (99307).

3      22.     The codes for subsequent evaluations are for less complex visits and require two

4  of three key components: (1) a problem focused interval history; (2) a problem focused

5  examination; or (3) medical decision making ranging from straightforward to complex (again the

6  more complex the decision making, the higher the code).  The typical time spent on these visits

7  at the patient's bedside and on the patient's floor or unit ranges from 10 minutes for the lowest

   CPT code (99307) to 25 minutes for the highest code (99309).

8      23.     While these two categories of CPT codes are labeled as "initial" and "subsequent"

9  nursing facility care, the appropriate code is not based on whether the patient is new or

10  established to the provider.  Medicare and Medicaid policies and procedures require that the

11  provider bill the code that most accurately reflects the services that were medically necessary and

12  provided.  *See* Medicare Claims Processing Manual, chpt. 12, § 30.6.10.  Thus, a provider must

13  bill a "subsequent" care CPT code for new patients where the services that were provided or

   medically necessary fail to meet the requirements of an initial care code, but meet the

14  requirements of the subsequent care code.  *Id.*

15      24.     The patients that United's wound care specialists treat are referred to United for a

16  specific and problem-focused evaluation of already-identified wounds that may warrant

17  treatment.  These patients are already under the care of the facilities, where they receive, upon

18  admission, a comprehensive evaluation by a qualified physician.  The patients then receive

19  regular monitoring and follow-up evaluations by the facility physicians and the nurses working

20  under their supervision.  In general, they are not in need of an additional comprehensive

   evaluation from United's wound care specialists.

21      25.     And, in general, the United wound care specialists do not perform comprehensive

22  E&M services on these patients, including new patients.  Most of United's new patient

23  evaluations are conducted in under 10 minutes, often in under five minutes, where the wound

24

COMPLAINT AND JURY DEMAND - 8

care specialists conduct a problem focused history and examination of the patients.  While these patients may be new, the services performed do not meet the CPT codes for initial patient care, as a detailed or comprehensive history and examination is not medically necessary or provided.

26.    But United's company-wide policy is that *every* new patient evaluation should be coded under a CPT code for initial E&M services (99304 – 99307), thus billing government healthcare programs, including Medicare and Medicaid, for services that were not provided or medically necessary.  The CPT codes for initial care are significantly more expensive than for subsequent care.

27.    To attempt to mask the fraud, United requires the wound specialists to check boxes of pre-selected organ systems, indicating that the specialists had examined them.  These systems included the eyes; ears, nose, mouth and throat; respiratory system; cardiovascular system; and lymph nodes.  Not only are such evaluations medically unnecessary for the specific and focused wound care issues that are referred to the specialists, it is impossible, given the time constraints, for the specialists to properly evaluate the systems.  Indeed, the specialists are not equipped with the basic tools necessary to perform these evaluations, such as stethoscopes, otoscopes, and ophthalmoscopes.

28.    During her orientation, CEO Dirks rounded with Plaintiff Walker to several facilities and observed her.  During this time, she questioned the medical necessity of the evaluation criteria, and how she was supposed to properly complete the criteria given her per-patient time constraints and lack of resources.  In response, he told her she did not need to do a full evaluation and that so long as the patient appeared healthy, she should just "check the boxes."  This is the instruction that Plaintiff Walker consistently received throughout her employment at United.

COMPLAINT AND JURY DEMAND - 9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

2.     **United's Improper Unbundling Scheme.**

29.     Under established Medicare and Medicaid policies, where a provider performs E&M services and then discovers and treats a condition resulting from the evaluation services in the same visit, the provider can bill only for the procedure.

30.     For example, according to the National Correct Coding Initiative ("NCCI") Policy Manuals for Medicare and Medicaid Services, developed by the Centers for Medicare & Medicaid Services ("CMS") and incorporated by law into Medicare and all state Medicaid programs:

> In general, E&M services performed on the same date of service as a minor surgical procedure are included in the payment of the procedure. The decision to perform a minor surgical procedure is included in the global surgical package for the minor surgical procedure and *shall* not be reported separately as an E&M service. However, a significant and separately identifiable E&M service unrelated to the decision to perform the minor surgical procedure is separately reportable with modifier 25. The E&M service and minor surgical procedure do not require different diagnoses. If a minor surgical procedure is performed on a new patient, the same rules for reporting E&M services apply. The fact that the patent is "new" to the provider is not sufficient alone to justify reporting an E&M procedure.

NCCI Medicare Policy Manual, chpt. 1, § D, p. 18 (2019) (emphasis added); NCCI Medicaid Policy Manual, chpt. 1, § D, p. 19 (2018) (emphasis in original).

31.     As described above, United wound specialists conducted a problem-focused evaluation on patients for wound treatment, usually focused on a specific condition that had already been identified by the United LPN or the facility. These evaluations often led to a decision to perform a procedure to treat the wound during the same visit, such as a wound debridement procedure. In such cases, the wound providers were required by United's policy to

COMPLAINT AND JURY DEMAND - 10

bill for both the E&M service and the procedure itself.  The E&M service was billed under CPT code 99304, 99305, or 99306 (the codes for initial nursing facility care), and the procedure was billed under a separate code, such as CPT code 11042 (the code for debridement).

32.    The unbundling of the E&M services from the procedure was accomplished with the CPT code known as modifier 25.  A modifier 25 code is only appropriate where the E&M services are for a significant and separately identifiable service unrelated to decision to perform the treatment.  The use of modifier 25 in these cases was inappropriate, as the procedures performed were not for significant and separately identifiable services unrelated to the wound care specialists' decision to perform the treatment.

33.    To the contrary, the procedures themselves, such as debridement, have a period of pre-procedure and post-procedure evaluation built into the criteria of the respective CPT codes. For example, the code for debridement of subcutaneous tissue (CPT code 11042), contains 11 minutes of pre-service time built into the procedure, including nine minutes of pre-evaluation time.  Plaintiff Walker would generally spend substantially less time than 11 minutes in pre-service time before performing an 11042 debridement.  In fact, she would typically spend three or four minutes or less with the patient prior to performing the procedure, as the referral was for a specific wound in a specific area that she examined briefly and then would decide to debride. Indeed, in most cases, the entire procedure, including the pre-procedure evaluation, the procedure itself, and the post-procedure evaluation would take under 10 minutes.

34.    But United's policy required her (and every other specialist) to enter a code for both the procedure and the evaluation with the modifier 25 code.  There were no exceptions to this policy.  The policy was communicated orally and in writing, including company-wide emails written by Dirks.  Plaintiff Walker and all other wound care specialists followed this procedure, resulting in thousands of false claims submitted to government health care programs, including Medicare, Medicaid, and the VHA.

COMPLAINT AND JURY DEMAND - 11

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave W, #300 | Seattle, WA 98119
Tel: 206-448-1777

35.     Billing for both the evaluation and the ensuing procedure was a revenue generating tactic of primary concern at United.  During weekly meetings Dirks and other senior management emphasized that wound care specialists should focus on evaluating new patients and then doing a procedure, as United would get paid for both the initial evaluation and the procedure.  Dirks and other senior management told the wound care specialists that nothing made United's CFO happier than a bill with charges for both an initial evaluation charge and a procedure.

### 3.     United's Illegal Bonus for Patient Referral Scheme.

36.     In or around July of 2018, United initiated a bonus program whereby United's LPN's were promised and received bonuses based on the number of patients they referred for evaluation to United's wound care specialists.  Under the bonus program, the LPNs were eligible to receive a percentage of their salary based directly on the number of patients they referred to the wound care specialists for evaluation.

37.     Immediately following the implementation of this bonus structure, Plaintiff Walker witnessed a significant increase in the number of patients referred to her by the United LPNs.  Many of these patients had no discernable wounds for evaluation despite reports by the LPNs to the contrary.  Because the LPNs referred these patients to Plaintiff Walker, she was required to examine them, and her superiors insisted that she chart and bill for the patients despite the fact that the patients had no condition that warranted an examination.

38.     The medically unreasonable and unnecessary evaluations that were improperly referred to Plaintiff Walker and billed to Medicare or Medicaid included the following:

COMPLAINT AND JURY DEMAND - 12

| Patient Identifier[1] | Date of Treatment | United LPN's Purported Basis for Referral | What Plaintiff Actually Observed |
|---|---|---|---|
| 1 | 8/15/2018 | Sacral pressure ulcer | There was no pressure ulcer present. |
| 2 | 8/15/2018 | Burns to upper arm | The burns were resolved, and the patient already had treatment orders from a clinic that saw her two days earlier. |
| 3 | 8/17/2018 | State 1 pressure ulcer | There was no ulcer present. |
| 4 | 8/21/2018 | Pressure ulcer to left great toe | There was no ulcer present. |
| 5 | 8/21/2018 | Pressure ulcer to left heal | There was no ulcer present. |
| 6 | 8/21/2018 | Yeast infection | There was no evidence of a yeast infection. |
| 7 | 8/21/2018 | Bilateral heel pressure ulcers | There were no ulcers present. |
| 8 | 8/21/2018 | Trauma wounds to 2nd and 4th right toes. | There were no wounds present on 4th toe.  The 2nd toe had a minor 0.3 mm scab, which had fallen off by the time of evaluation. |
| 9 | 11/30/2018 | Pressure ulcer to buttock | There was no pressure ulcer present. |
| 10 | 12/7/2018 | Pressure ulcer to heel | There was no pressure ulcer present. |
| 11 | 12/7/2018 | Pressure ulcer to heal and yeast rash | There was no pressure ulcer or yeast rash present. |
| 12 | 12/7/2018 | Yeast infection and pressure ulcer on toe | There was no yeast infection or pressure ulcer.  The right toe had a minor wart. |
| 13 | 12/7/2018 | Pressure ulcer on left metatarsal head and moisture associated skin damage ("MASD") | There was no ulcer or MASD present. |
| 14 | 7/1/2019 | Rash under left breast | There was no rash present. |
| 15 | 7/1/2019 | Moisture related skin damage | There was no skin damage present. |
| 16 | 7/23/2019 | Wound in sacral area reported as "other" | The patient had minor MASD which was already being treated. |

---

[1] Due to confidentiality concerns, the names of the patients have been withheld from this pleading and replaced with identifiers.  Plaintiff will provide more details about these patients at the appropriate time in a manner that appropriately protects the identities of these patients from public disclosure.

COMPLAINT AND JURY DEMAND - 13

39.     On July 23, 2019, at one particular facility, a United LPN referred to Plaintiff Walker at least 14 patients where he falsely represented that the patients had wounds needing evaluation.  The United LPN was suspiciously vague in identifying the wounds needing treatment in many of these patients, listing the condition as "other," with a general reference to the area of the body.  Plaintiff Walker evaluated these patients and saw no evidence of wounds. Nurses at the facility were angry at the number of patients with non-issues being seen and accused United of inappropriately increasing patient referrals for more money.  One of the patients accused the United LPN of making up a wound that did not exist on the patient.

40.     United's bonus program rewarding the United LPN's based on the number of referrals violates the AKS.  The AKS forbids anyone from knowingly and willfully paying any renumeration, including kickbacks, bribes, or rebates, to any person to induce such person to refer an individual for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program.  42 U.S.C. §1320a-7b(b)(2)(B).  Any claim that results from a violation of the AKS constitutes a false or fraudulent claim under the FCA.  42 U.S.C. § 1320a-7b(h).

41.     The AKS excludes from liability "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services."  42 U.S.C. § 1320a-7b(b)(3)(B).  This exclusion, however, does not apply to bonuses given to employees for referrals, as referrals do not generally constitute the "provision of covered items or services."

42.     United's bonus program where the bonus amount is tied directly to the number of referrals the LPNs make to the wound care specialists for treatment constitutes an illegal renumeration to induce the LPNs to refer individuals for the furnishing of services for which payment was made in whole or in part by federal healthcare programs, including Medicare, Medicaid, and the VHA.  This conduct does not fall under the employee safe harbor provision of the AKS, because the referrals themselves do not constitute the "provision of covered items or

COMPLAINT AND JURY DEMAND - 14

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave W, #300 | Seattle, WA 98119
Tel: 206-448-1777

services." Therefore, United's bonus program is in violation of the AKS, and, as a result, all

claims submitted to federal healthcare programs for patients that the United LPNs referred for

treatment pursuant to the illegal bonus program are false claims in violation of the FCA.

**B.    Plaintiff Walker Reported the Misconduct and Was Fired.**

43.    Plaintiff Walker became increasingly concerned about the unethical conduct she

observed at United, including the influx of patients with no issues that were referred to her.   On

August 6, 2019, she emailed Dirks and United's Chief Medical Officer, expressing her concerns

about the way the skin sweeps and referrals were handled.  She wrote that United LPNs were

referring patients who did not need treatment, and she listed specific examples of the patients

that were improperly referred to her.  She noted that the facilities were aggravated by the

excessive referrals and questioned United's motives.  She further wrote that she did not chart or

bill for several patients, stating: "I personally don't find it ethical to chart a new [patient] visit

where there is no wound, or no evidence of a wound, or scab when the facility did not

identify these to be sent for referrals.... This is not the first time I have had facilities

complain after skin sweeps about the way [the United LPN] goes about doing them. He can

be very intimidating. Remarks have been made to the effect that UWH is just doing this to

make money."

44.    In response to the email, Dirks falsely stated that the patients were asked to be

seen by the facility and stated that it was United's policy to consult on any skin or wound

condition the facility had concerns about it.  He then reprimanded Plaintiff for not including the

United LPN on the email, and accused her, falsely, of being difficult with the nursing staff at the

facility.  He admonished that she must represent the company in a positive way and that, if not,

United would need to reconsider her position at United.

45.    A few weeks later, on August 30, 2019, United abruptly terminated Plaintiff

Walker due to what they claimed were complaints of "unprofessional behavior" from facilities.

COMPLAINT AND JURY DEMAND - 15

46.     These stated reasons for Plaintiff Walker's termination were a sham.  Plaintiff worked tirelessly with her facilities and was commended by their staff for her professionalism and the quality of her care.  The real reason that United terminated Plaintiff Walker was because she complained about the unethical conduct described above and refused to chart and bill government healthcare programs for patient examinations that she believed were medically unnecessary.

**C.     United's False Claims to the Government.**

47.     As discussed above, United's illegal practices extend to government healthcare programs, including Medicare, Medicaid, and VHA.  With each claim submitted, United made or caused others to make several false statements and certifications, both express and implied, to these programs.

48.     The relevant certifications that United and its providers made include the following.  When enrolling to participate in the Medicare Program, the wound care specialists themselves submitted Form CMS-855I.  When the providers signed and submitted Form CMS-855I, they attested as follows:

***

(3) I agree to abide by the Medicare laws, regulations and program instructions….
I understand that payment of a claim by Medicare is conditioned upon the claim
and the underlying transaction complying with such laws, regulations, and
program instructions (including, but not limited to, the federal anti-kickback
statute and the Stark law), and on the supplier's compliance with all applicable
conditions of participation in Medicare.

***

(6) I will not knowingly present or cause to be presented a false or fraudulent
claim for payment by Medicare, and I will not submit claims with deliberate
ignorance or reckless disregard of their truth or falsity.

COMPLAINT AND JURY DEMAND - 16

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave W, #300 | Seattle, WA  98119
Tel: 206-448-1777

*See* Form CMS-855I.

49.      Because the United providers operated in a practice group or organizational setting, they were required to, and did, complete Form CMS-855R, which reassigned the benefits to United who billed for the wound care specialists' services.  In turn, United was required to, and did, complete Form CMS-855B to be eligible to participate in the Medicare Program.  In so doing, United signed the "Certification Section" in Section 15, which "legally and financially binds [the] supplier to all of the laws, regulations and program instructions of the Medicare Program," and contains the same certification language as Form CMS-855I described above:

***

> (3) I agree to abide by the Medicare laws, regulations and program
> instructions.... I understand that payment of a claim by Medicare is
> conditioned upon the claim and the underlying transaction complying with
> such laws, regulations, and program instructions (including, but not limited to,
> the federal anti-kickback statute and the Stark law), and on the supplier's
> compliance with all applicable conditions of participation in Medicare.

***

> (6) I will not knowingly present or cause to be presented a false or fraudulent
> claim for payment by Medicare, and I will not submit claims with deliberate
> ignorance or reckless disregard of their truth or falsity.

*See* Form CMS-855B.

50.      Further, with each claim submitted to government healthcare programs, including Medicare, Medicaid, and the VHA, the United wound care specialists were required to, and did, complete and submit Form CMS-1500, the health insurance claim form, where they documented, among other things, the CPT codes for the services provided, and certified as follows:

> • "[T]his claim, whether submitted by me or on my behalf by my designated
>   billing company, complies with all applicable Medicare and/or Medicaid

COMPLAINT AND JURY DEMAND - 17

laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as the Stark statute)";

- "The services on this form were medically necessary and personally furnished incident to my professional…"; and
- "I certify that the services listed above were medically indicated and necessary to the health of this patient…."

*See* Form CMS-1500.

51.     Thus, for each claim that United (1) improperly upcoded as a comprehensive E&M service; (2) improperly unbundled with modifier 25; or (3) improperly referred to United wound care specialists in violation of the AKS—United, both expressly and implicitly, made or caused its wound care specialists to make the above certifications, all of which were false.

## V.     CLAIMS FOR RELIEF

### Count 1—Violation of the False Claims Act

52.     Plaintiff/Relator realleges and incorporates by reference the prior paragraphs as if fully set forth herein.

53.     Based on the acts described above, in violation of 31 U.S.C. § 3729(a) of the FCA,  United (1) knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, and/or (2) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States.

54.     The false and fraudulent claims and statements that United made or caused others to make were material, as they had a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  Indeed, had the federal healthcare programs been aware of the false and fraudulent nature of the claims, statements, and omissions, the claims would not have been paid.

COMPLAINT AND JURY DEMAND - 18

55.     By reason of these false or fraudulent claims or statements, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**Count 2—Violation of the Washington Medicaid Fraud False Claims Act, Wash. Rev. Code Ann. §§ 74.66.005 – 74.66.130**

56.     Plaintiff realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

57.     United violated the Washington Medicaid Fraud False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Washington as described herein.

58.     As a result of the misconduct alleged herein, United knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Washington.

59.     The State of Washington, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Washington would not otherwise have paid.

60.     By reason of these payments, the State of Washington has been damaged, and continues to be damaged, in a substantial amount.

**Count 3—Wrongful Termination in Violation of the False Claims Act, 31 U.S.C. 3730(h)**

61.     Plaintiff realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

62.     The FCA forbids employers from discharging, demoting, suspending, threatening, harassing, or otherwise discriminating against an employee for an employee's lawful action done in furtherance of an FCA claim or for any other efforts to stop the employee from committing one or more FCA violations.  31 U.S.C. § 3730(h)(1).

COMPLAINT AND JURY DEMAND - 19

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave W, #300 | Seattle, WA  98119
Tel: 206-448-1777

CRITICAL

63.     United violated this section by harassing, discharging, threatening, demoting, and discriminating against Plaintiff for complaining of and refusing to engage in the wrongful practices described above.

64.     As a result, Plaintiff has suffered substantial damages, and is entitled to all remedies available at law and equity, including those listed in 31 U.S.C. § 3730(h)(2).

**Count 4—Common Law Wrongful Termination**

65.     Plaintiff Walker realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

66.     There is a clear public policy against firing employees for refusing to commit an illegal act or in retaliation for reporting employer misconduct, i.e., whistleblowing. Discouraging employees from refraining from illegal activity or from whistleblowing jeopardizes these public policies.

67.     United wrongfully retaliated against and terminated Plaintiff Walker for refusing to participate in the illegal conduct described herein and for reporting it to her superiors.

68.     There was no overriding justification for United's retaliation and wrongful discharge of Plaintiff.

69.     As a result of this retaliation and wrongful termination, Plaintiff has suffered substantial injury and is entitled to all available remedies at law or equity.

70.     United's conduct was malicious, willful, wanton, and done in reckless disregard of Plaintiff's rights, and thus she is entitled to an award of punitive damages.

**VI.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that judgment be entered against Defendant United as follows:

(1) Treble the United States' and the State of Washington's damages in an amount to be determined at trial, plus the maximum statutorily-allowed penalty for each false claim submitted in violation of the FCA or WFCA statutes set forth above;

COMPLAINT AND JURY DEMAND - 20

(2) Plaintiff Walker's damages under the FCA and applicable common law that she

sustained as a result of United's retaliation and wrongful termination;

(3) Punitive damages for United's malicious, willful, wanton, and reckless conduct in

retaliating against and wrongfully terminating Plaintiff;

(4) Plaintiff's reasonable attorneys' fees and costs;

(5) The maximum Relator award available under the FCA and equivalent false claims

statutes of the Plaintiff States described above; and

(6) For any further relief the Court deems appropriate.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

DATED:  October 4, 2019.

Respectfully submitted.

Brad J. Moore, WSBA #21902
STRITMATTER KESSLER KOEHLER MOORE
3600 15th Avenue West, #300
Seattle, WA 98119
Telephone:  206-448-1777
Facsimile:  206-728-2131
brad@stritmatter.com

Counsel for Plaintiffs

**DO NOT SERVE**

COMPLAINT AND JURY DEMAND - 21